**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON**

**DANNY LESTER BURKS,**

    **Plaintiff,**

**v.**                                         **Civil Action No. 3:17-cv-01978**

**NANCY A. BERRYHILL,
ACTING COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATION**

Pending before this Court is Plaintiff's Brief in Support of Judgment on the Pleadings in a Social Security Case (ECF No. 9) and Defendant's Brief in Support of Defendant's Decision (ECF No. 12). This is an action seeking review of the decision of the Commissioner of Social Security denying Claimant's application for disability insurance benefits (DIB) under Title II of the Social Security Act.

Background

Claimant, Danny Lester Burks, filed an application for DIB on May 4, 2012. Claimant alleged disability beginning January 1, 2012. The claim was denied initially on December 18, 2012, and upon reconsideration on June 7, 2013. Claimant filed a request for a hearing on July 24, 2013. A video hearing was held on November 21, 2014. A supplemental video hearing was held on June 4, 2015. Claimant appeared for both hearings in Huntington, West Virginia, and the Administrative Law Judge presided over the video hearings from Saint Louis, Missouri. The Administrative Law Judge (ALJ) denied Claimant's applications on August 12, 2015. Subsequently, Claimant sought review of the ALJ's decision by the Appeals Council. The Appeals

1

Council denied Claimant's request for review on January 17, 2017.  Thereafter, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Standard of Review

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability.  *See Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. §§ 404.1520, 416.920 (2017).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  *Id.* §§ 404.1520(a), 416.920.  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  *Id.* §§ 404.1520(b), 416.920.  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  *Id.* §§ 404.1520(c), 416.920.  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.   *Id.* §§ 404.1520(d), 416.920.  If it does, the claimant is found disabled and awarded benefits.  *Id.*  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  *Id.* §§ 404.1520(e), 416.920.  By satisfying inquiry four, the claimant establishes a *prima facie* case of disability.  *Hall v. Harris,* 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's

2

remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920 (2017). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

*(c) Rating the degree of functional limitation.*

> (1)    Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2)    We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the

3

amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation:

Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1). Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the

claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.  20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since January 1, 2012 (Tr. at 36). Claimant met the insured status requirements of the Social Security Act through June 30, 2017.  (*Id.*)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments: lumbosacral spondylosis status post surgery; anxiety disorders; and affective disorder.  (*Id.*)  At the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled the level of severity of any listing in Appendix 1 (Tr. at 37).  The ALJ then found that Claimant has a residual functional capacity to perform light work with the following limitations: lifting up to 20 pounds occasionally and 10 pounds frequently; standing and walking for about 6 hours; and sitting for up to 6 hours in an 8-hour workday, with normal breaks.  Claimant is able to occasionally crawl, crouch, kneel, stoop, balance and climb ramps or stairs, but never climb ladders, ropes or scaffolds.  Claimant is able to perform work that

does not involve concentrated exposure to extreme cold, use of moving machinery, unprotected heights or excessive vibration. Further, the Claimant is able to perform simple, routine and repetitive tasks in an environment free of fast paced production requirements, involving only simple work related decisions and routine workplace changes, with only occasional interaction with coworkers and the public (Tr. at 39). The ALJ found that Claimant cannot perform past relevant work (Tr. at 44). The ALJ found that Claimant can perform jobs that exist in significant numbers in the national economy such as merchandise maker, housekeeping cleaner and mail clerk (Tr. at 44-45). On this basis, Claimant's application was denied (Tr. at 45-46).

<u>Scope of Review</u>

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In *Blalock v. Richardson*, substantial evidence was defined as:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974).

A further review of the record reveals the decision of the Commissioner in this case is supported by substantial evidence.

Claimant's Background

Claimant was born on May 24, 1969.  Claimant has a high school education.  He was placed in special education classes from the 8th grade to the 11th grade.  In the 11th grade, Claimant's only special education class was math.

Medical Record

The medical record has been adopted, as set out in the Claimant's Brief, Defendant's Brief and the ALJ's decision to the extent as follows.

On October 21, 2011, Jason Hudak, M.D., at Hudak Family Medicine, PLLC, saw Claimant in a follow-up visit regarding anxiety and started Claimant on Sertraline (Zoloft) (Tr. at 436). By November 2011, Claimant indicated that his anxiety had improved (Tr. at 438).  Dr. Hudak continued to prescribe Zoloft (Tr. 439, 441, 640-642, 774). Dr. Hudak performed physical examinations on Claimant on November 21, 2011, and December 28, 2011.  These examinations revealed that Claimant's motor function, sensory function, reflexes, gait and coordination were all intact (Tr. at 437, 439).

On January 4, 2012, Claimant saw neurosurgeon David L. Weinsweig, M.D., for an exacerbation of lower back pain into the right leg that had started about six weeks ago (Tr. at 467). Claimant reported that he has had back pain for 20 years (Tr. at 467). He also reported that he had just started physical therapy (Tr. at 467). A physical examination revealed that Burks had full cervical/lumbar range of motion (Tr. at 467). The neurological examination revealed that Burks' motor strength was 5/5 in both the upper and lower extremities; his muscle bulk and tone were normal; his sensation was intact to light touch, pinprick, and proprioception; his gait, including tandem gait, was normal; and straight leg-raising and hip rotation tests were negative bilaterally (Tr. at 467-469).  Dr. Weinsweig reviewed an MRI of the lumbar spine which showed central disc

protrusion as L5-S1 with degenerative disc disease and spondylolisthesis Grade 1 at L4-5 (Tr. at 469, 476). Dr. Weinsweig's diagnostic impression was chronic pain related to degenerative disc disease with spondylolisthesis in the lumbar spine (Tr. at 469). Dr. Weinsweig presented Claimant with the following options: living with the pain, physical therapy, pain clinic or an operation (Tr. at 469). Claimant stated that he did not want anything drastic done and stated he wanted to continue with physical therapy (Tr. at 469).

On February 16, 2012, Robert Thomas, DPT, a physical therapist with Generations Physical Therapy, summarized Claimant's progress at his seventh treatment session (Tr. at 445-448). Mr. Thomas noted that Claimant had stopped working at his job which required constant standing and intermittent lifting for 10 hours shifts (Tr. at 445). Claimant reported that his low back pain was improving and he was very pleased with his progress. He also indicated that he had less pain following two lumbar injections and he had been able to resume a home exercise program (Tr. at 445). Functional gains included "[i]mproved lumbar mobility and tolerance to home program" (Tr. at 445). Claimant's muscle strength was 4/5 to 5/5 (Tr. at 446). On March 6, 2012, Dr. Hudak performed a musculoskeletal examination which revealed normal range of motion, strength and tone (Tr. at 442).

On May 8, 2012, Dr. Weinsweig saw Claimant for follow-up care. Claimant complained of significant "discomfort" in his back and down both legs (Tr. at 479). Claimant reported that neither physical therapy nor two epidural steroid injections had been helpful (Tr. at 479). He informed Dr. Weinsweig that he wanted to have surgery (Tr. at 479). A neurological examination revealed 5/5 strength in the upper and lower extremities; normal muscle bulk and tone; intact sensation to light touch, pinprick, and proprioception; normal gait, including tandem gait; and negative straight leg-raising and hip rotation tests bilaterally (Tr. at 479-481). A myelogram CT

scan of the lumbar spine showed spondylolisthesis L/4 on L/5, degenerative disc disease at L/4-5 with foraminal stenosis, and some protruding of the disc at L5 S/1 (Tr. at 481, 547-48).

On June 14, 2012, Dr. Weinsweig performed a bilateral L4 laminectomy with superior L5 laminectomy, posterior lumbar interbody fusion, and lateral mass/facet/transverse process arthrodesis (Tr. at 767-769). At a follow up visit on June 21, 2012, Claimant told Dr. Hudak that he was "doing really well from surgery" (Tr. at 642). A physical examination revealed that motor and sensory function, reflexes, gait and coordination were all intact (Tr. at 642).

Claimant saw Dr. Weinsweig on August 21, 2012, for status post lumbar decompression and fusion at about nine weeks (Tr. at 647). Dr. Weinsweig noted that Burks was "doing extremely well" and that his x-rays looked great (Tr. at 647). Dr. Weinsweig recommended that Burks wear a brace for a total of three months and then start physical therapy (Tr. at 647). X-rays of the lumbar spine from August 21, 2012, revealed status post posterior fusion of L4-L5 with minimal spondylolisthesis (Tr. at 654).

On October 10, 2012, Dr. Weinsweig wrote a letter in which he stated that Claimant's job as a worker in a grocery store warehouse required a significant amount of lifting, bending, and twisting and due to this type of work, it was likely he would have to remain off work for 3-6 months or perhaps longer based on his recovery progress (Tr. at 766).

On October 16, 2012, Dr. Weinsweig saw Claimant "status post lumbar decompression and fusion at about four months ago" (Tr. at 675). In a letter to Dr. Hudak, Dr. Weinsweig stated, "overall he is doing well" and "[h]is wounds look good" (Tr. at 675). Claimant's only complaint was some pain over the incision area on the left side (Tr. at 675). Claimant had been to physical therapy and Dr. Weinsweig stated, "at this point he seems to be doing well" (Tr. at 675).

On October 26, 2012, Karl G. Hursey, a state agency psychologist, found that Claimant

had an anxiety disorder that, within the meaning of the Commissioner's regulations, was non-severe (Tr. at 125).

On November 14, 2012, Emma Park, PT, a physical therapist at St. Mary's Rehabilitation Services, prepared a discharge summary (Tr. at 682-683). Ms. Park noted that Claimant still guarded with movement but was functional (Tr. at 683). She stated he tolerated an elliptical machine, bike, walking and the total gym as part of his exercise program; and he was independent in his home exercise program (Tr. at 683). Ms. Park recommended continued strengthening and aerobic conditioning (Tr. at 683). Claimant complained of intermittent pain across the back but ambulated independently (Tr. at 683). He denied lower extremity pain (Tr. at 683).

On December 18, 2012, James Egnor, M.D., a state agency medical consultant, performed a residual functional capacity (RFC) assessment based on his review of the record (Tr. at 126-128). Dr. Egnor found that Claimant could lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday and push and/or pull without limitation except as shown for his ability to lift/carry (Tr. at 126). Dr. Egnor also found that Claimant could climb ramps/stairs, climb ladders/ropes/scaffolds, balance, stoop, kneel, crouch and crawl occasionally and that he would need to avoid concentrated exposure to extreme cold and vibration (Tr. at 126-127).

On January 7, 2013, Dr. Weinsweig wrote a letter in which he stated that Claimant could not return to his previous employment due to post-surgery restrictions and because his position did not allow for light duty (Tr. at 765). Dr. Weinsweig stated, "Mr. Burks will not likely be able to perform heavy manual labor in any position any time in the near future" (Tr. at 765).

On March 12, 2013, A. Rafael Gomez, M.D., a state agency medical consultant, independently reviewed the updated record and affirmed Dr. Egnor's physical RFC assessment as

written (Tr. at 142-144).

On April 9, 2013, Dr. Weinsweig saw Claimant for follow-up care, and he complained of leg pain (Tr. at 808-810). A physical examination revealed some decreased range of motion of the lumbar spine on flexion/extension (Tr. at 809). Claimant was alert and oriented to person, place, and time; his recent memory was intact; and his remote memory was intact. (*Id.*) Dr. Weinsweig noted that when assessing Claimant's attention span/concentration that he followed complex commands briskly. (*Id.*) Burks had 5/5 strength in his upper and lower extremities, his muscle bulk and tone were normal, his sensation was intact to joint position and pinprick throughout, his gait was normal and straight leg-raising and hip rotation tests were negative bilaterally (Tr. at 809). Dr. Weinsweig noted that Claimant had some recurrence of leg "discomfort" and recommended an MRI of the lumbar spine (Tr. at 809).

On April 10, 2013, Lisa C. Tate, M.A., a licensed psychologist, performed a consultative Mental Status Examination for West Virginia Disability Determination Service (Tr. at 781-784). Claimant complained of anxiety for the past two years but reported no history of mental health treatment (Tr. at 782). He reported that he felt uncomfortable in a public setting and preferred to stay at home. (*Id.*) Claimant indicated to Ms. Tate that he had no recent illnesses, injuries or hospitalizations. (*Id.*) He had gained 20 pounds in the past three months, with increased appetite. (*Id.*) In describing a typical day, Claimant stated that he walked for about an hour on nice days, watched television, picked up [around] the house, read and spent time on the computer (Tr. at 784). When asked to describe his daily activities, Claimant stated "On nice weather days, I try to get out and walk about an hour, other than that I stay in the house." (*Id.*) Claimant did not bring his medications to the appointment on April 10, 2013, but reported that he was taking Zoloft (Tr. at 782).

The MSE revealed that Claimant was alert and oriented (Tr. at 783). His mood was anxious; his affect mildly restricted; his thought processes were logical and coherent; there was no indication of delusions, obsessive thoughts or compulsive behaviors; he reported no unusual perceptual experiences; his insight was fair; his judgment was within normal limits; he denied suicidal or homicidal ideation; his immediate memory was within normal limits; his recent memory was mildly deficient; his remote memory was within normal limits; and his concentration was mildly deficient. (*Id.*) Ms. Tate opined that Claimant's social functioning was within normal limits, his pace was within normal limits, his persistence was within normal limits and his concentration was mildly deficient (Tr. at 784).   Diagnoses included anxiety disorder, not otherwise specified; and cannabis abuse, in remission (Tr. at 783-784).

On April 17, 2013, Debra Stultz, M.D., saw Claimant for depression and anxiety (Tr. at 788). Claimant complained of panic, agoraphobia and social phobia. (*Id.*)  Diagnoses included major depressive episode (MDE), generalized anxiety disorder (GAD) and panic disorder (Tr. at 791).  Dr. Stultz saw Burks on July 10, 2013, but did not see him again until August 19, 2014 (Tr. at 834).  On August 19, 2014, Dr. Stultz saw Burks for the first time in over a year. (*Id.*)  Claimant stated that his mood swings were better with medication but reported anxiety.  (*Id.*)  He told Dr. Stultz that he was "always suspicious and paranoid." (*Id.*)  On September 25, 2014, Claimant reported to Dr. Stultz that he was sleeping during the day and not leaving the house (Tr. at 837). A mental status examination was negative for suspiciousness, hallucinations or suicidal or homicidal ideation. (*Id.*)  On November 6, 2014, Claimant told Dr. Stultz that he was getting out more and had a new puppy (Tr. at 839).  On January 13, 2015, Claimant reported to Dr. Stultz that his mood was "pretty good" (Tr. at 860).

Dr. Stultz noted that symptoms associated with sleep, appetite, energy, concentration,

memory, interests and motivation had all improved, although Claimant reported panic attacks approximately two times a week. (*Id.*) The examination was negative for suspiciousness, hallucinations, or suicidal or homicidal ideation. (*Id.*) Dr. Stultz did not see Claimant again until July 7, 2015, at which time he endorsed panic attacks and social anxiety but less depression (Tr. at 858).

On April 18, 2013, Holly Cloonan, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form based on her review of the updated record (Tr. at 140-141). Dr. Cloonan found that Claimant had an anxiety disorder that was not of listing level severity as it resulted in mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace and no repeated episodes of decompensation, each of extended duration (Tr. at 141). Dr. Cloonan noted that Claimant's mental functional capacity did not appear limited based on the assessment performed at the consultative examination. (*Id.*)

On April 18, 2013, Dr. Cloonan performed a mental RFC assessment based on her review of the record (Tr. at 144-146). In the area of understanding and memory, Dr. Cloonan found that Burks had no significant limitations in his ability to remember locations and work-like procedures and understand and remember very short and simple instructions; and moderate limitations in his ability to understand and remember detailed instructions (Tr. at 145). With respect to concentration and persistence, Dr. Cloonan found that Burks had no significant limitations in his ability to carry out very short and simple instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, make simple work-

related decisions, complete a normal workday and workweek without interruptions from psychologically-based symptoms, and perform at a consistent pace without an unreasonable number of rest periods; and moderate limitations in his ability to carry out detailed instructions (Tr. at 145-146). With respect to social interaction, Dr. Cloonan found that Claimant had no significant limitations in his ability to ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and moderate limitations in his ability to interact appropriately with the general public and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (*Id.*) Dr. Cloonan found that Burks had no adaptation limitations (Tr. at 146). Dr. Cloonan concluded that Claimant was able to learn, remember and perform routine work-like activities involving simple instructions in settings with no more than superficial and occasional interactions with the general public and coworkers. (*Id.*)

On May 7, 2013, Claimant saw Dr. Weinsweig and told him that he was "doing better" (Tr. at 818). Dr. Weinsweig noted that Claimant still had some "discomfort," particularly in the morning, which was typical of degenerative arthritic discomfort. (*Id.*) Dr. Weinsweig reviewed x-rays of the lumbar spine which showed that the fusion area looked good and stable (Tr. at 815, 819). He also reviewed an April 24, 2013, MRI of the lumbar spine which showed no significant stenosis and some disc bulging centrally at L5-S1 that was not severe (Tr. at 817, 819). Although Claimant complained of chronic pain, Dr. Weinsweig opined that he had improved since his surgery almost one year ago (Tr. at 819). Dr. Weinsweig recommended physical therapy (Tr. at 820).

On May 13, 2013, Dr. Weinsweig wrote a letter in which he stated that he had recently evaluated Claimant and he opined that Burks had improved from his surgery but had chronic pain and leg weakness (Tr. at 822). Dr. Weinsweig stated, "I do not believe it is likely he will be able to perform any heavy manual labor in any position in the near future." (*Id.*) On July 29, 2013, Dr. Weinsweig wrote a letter in which he stated he last evaluated Burks on May 7, 2013 (Tr. at 841). Dr. Weinsweig again stated, "I do not believe it is likely he will be able to perform any heavy manual labor in any position in the near future." (*Id.*)

Claimant's Testimony

At the hearing on November 21, 2014, Claimant testified that his back started hurting while he was at work (Tr. at 63-64). He stated that he had had a back problem since high school but that it had gotten worse (Tr. at 64). He also stated that he left his job voluntarily. (*Id.*) When asked why he had not been back to a back doctor if his back was hurting him so badly, Claimant stated that he was told there was nothing else that could be done for him (Tr. at 70).

At the second hearing on June 4, 2015, counsel stated that he was not aware of any additional information or evidence that would support Claimant's claim (Tr. at 78). When asked what kept him from working, Claimant stated that he could not stand for more than 30 minutes without a great deal of pain, was unable to concentrate due to pain and that running a forklift took a lot of concentration and "it's the pain that's keeping me from doing it" (Tr. at 108). Claimant also stated that he did not go anywhere and that being around a lot of people made him nervous (Tr. at 94-95).

Claimant testified that despite medications, he was physically in pain all of the time (Tr. at 95). He claimed that he could not make a bed, run a vacuum cleaner, take a shower on his own, cook anything other than a bowl of cereal, do laundry, do gardening or mow the grass (Tr. at 96-

15

97, 99). He also claimed that his ability to concentrate was affected by anxiety and pain from his back surgeries (Tr. at 97).

The ALJ noted that there were no records from Debra Stultz, M.D., with Sleep and Behavioral Health R.E.S.T. Sleep Lab, since November 2014 (Tr. at 106). Counsel agreed to follow up with Dr. Stultz to obtain any outstanding records (Tr. at 106-107). When asked whether he had been to see Dr. Stultz in 2015, Claimant stated, "[y]eah" and then replied, "I'm pretty sure I have" (Tr. at 107). He acknowledged that he had not been to any doctor other than Dr. Stultz in 2015. (*Id.*)

John Paul Schosheim, M.D., a board certified psychiatrist, testified as a medical expert (Tr. at 79). Dr. Schosheim testified that from a psychiatric perspective, the major problem was generalized anxiety disorder (Tr. at 86). Dr. Schosheim also testified that there was no documentation in the record that would support a diagnosis of major depressive disorder with psychotic features, and that the record seemed to support a diagnosis of generalized anxiety disorder only. (*Id.*)

Dr. Schosheim further testified that Claimant did not meet or equal an impairment under any of the Social Security listings. (*Id.*) Dr. Schosheim opined that any limitations associated with Claimant's anxiety disorder were mild to moderate, and that there was no reason for Claimant to be unable to engage in some sort of work (Tr. at 87).

<u>Vocational Expert's Testimony</u>

Leslie Rice, Vocational Expert (VE) described Claimant's past relevant work as a forklift operator as medium in exertional level and semi-skilled (Tr. at 110-111). The ALJ asked the VE to assume that a hypothetical individual with Claimant's vocational profile who could lift, carry, push, and pull up to 20 pounds occasionally; could lift/carry up to 10 pounds frequently; could

16

stand and walk for about six hours and sit for up to six hours in and eight-hour workday with normal breaks; could never climb ladders, ropes, or scaffolds; could occasionally perform other postural maneuvers; and would need to avoid concentrated exposure to extreme cold, excessive vibration, use of moving machinery, and unprotected heights (Tr. at 111-112). The ALJ also asked Ms. Rice to assume that the individual would be limited to simple, routine, repetitive tasks in a work environment free of fast paced production requirements, involving only simple work-related decisions and routine workplace changes, with only occasional interaction with the public and co-workers (Tr. at 111). The VE testified that the individual could not perform Claimant's past relevant work but would be able to perform other work that exists in significant numbers in the national economy including the unskilled light jobs of merchandise marker, housekeeping cleaner and mailroom clerk (Tr. at 112-113).

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant asserts that the ALJ failed to arrange for a psychological expert and an orthopedic expert at the subsequent hearing (ECF No. 9). Additionally, Claimant avers that the ALJ failed to consider the substantial changes in Claimant's residual functional capacity (RFC) assessment. (*Id.*) In response, Defendant asserts that the ALJ acted within his discretion in declining to obtain a medical expert to testify at the hearing (ECF No. 12). Defendant asserts that substantial evidence, including the testimony of a psychiatrist at the supplemental hearing, supports the ALJ's decision that Claimant's mental impairments were not disabling. (*Id.*) Furthermore, Defendant avers that substantial evidence supports the ALJ's decision that Claimant's back impairment improved during the relevant period. (*Id.*)

17

Residual Functional Capacity (RFC)

Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record, including the effects of treatment and the limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication. *Id.* at *5. Social Security Ruling 96-8p explains that the RFC "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Monroe v. Colvin,* 826 F.3d 176, 179-80. (4th Cir. 2016). (citing *Mascio v. Colvin*, 780 F.3d 632, 635 (4th Cir. 2015). (quoting SSR 96-8p, 61 Fed. Reg. at 34, 478; see also *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (observing that the ALJ "must build an accurate and logical bridge from the evidence to his conclusion").

An RFC refers to the most a claimant can still do despite his limitations and is an assessment that is based upon all of the relevant evidence, including descriptions of limitations. 20 C.F.R. §§ 416.945(a), 404.1545.  The Fourth Circuit has held that "[a] necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling," including "a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence."  *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013).

The final responsibility for determining a claimant's RFC is reserved to the Commissioner, who will not give any special significance to the source of another opinion on this issue. 20 C.F.R. §§ 416. 927(d)(2), (3), 404.1527. For cases at the hearing level, the responsibility for determining a claimant's RFC rests with the ALJ. 20 C.F.R. §§ 416.946, 404.1546.  Therefore, an ALJ  clearly has the duty and authority to make an independent assessment of a claimant's RFC based  on the evidence of record.

18

Consultative Evaluation

Pursuant to the regulations, the need to further develop the record only arises when the evidence is "insufficient or inconsistent" to make findings about what the evidence shows. 20 C.F.R. § 404.1520b; *Poe v. Colvin*, No. 2:14-15940, 2015 WL 5438980, at *5 (S.D.W.Va. Aug 25, 2015), *adopted by* 2015 WL 543791 (S.D.W.Va. Sept. 14, 2015). It is within the discretion of the ALJ to determine whether there is a need to take additional actions in order to seek clarification from a medical source. "If the evidence in your case record is insufficient or inconsistent, we may need to take additional actions, as we explain in paragraphs (b) and (c) of this section." 20 C.F.R. § 404.1520b; *see also Lichlyter v. Astrue*, No. 6:11-cv-00597, 2012 WL 4442521, at *18 (S.D.W.Va. May 22, 2012), *adopted by* 2012 WL 4378142 (S.D. W.Va. Sept. 25, 2012); *Glenn v. Colvin*, No. 8:13-2099-BHH, 2015 WL 628518, at *6 (D.S.C. Feb. 12, 2015) (recognizing that the ALJ has the discretion to determine whether to further develop the record); *accord Seaberry v. Colvin*, No. 5:15-CV-00240-D, 2016 WL 3774384, at *3 (E.D.N.C. June 22, 2016); *Humphries v. Colvin*, No. 3:15-cv-188 (MHL), 2015 WL 2015 9942619, at *6 (E.D.Va. Dec. 31, 2015), *adopted by* 2016 WL 356086; *Edmunds v. Colvin*, No. 4:12-cv-00051, 2013 WL 4451224, at *6 (W.D. Va. Aug. 16, 2013).

Discussion

Claimant argues in the Plaintiff's Brief in Support of Judgment on the Pleadings in a Social Security Case that "While only in a specific number of cases is the ALJ required to consult a medical expert, but many circumstances under which an ALJ has discretion to call and ME" (ECF No. 9). Claimant asserts that he was prejudiced because he was "left with the assumption that there would be a medical expert which affects how the Claimant's case would be developed for the supplemental hearing." (*Id.*) Claimant avers that he did not have warning as to what was going

19

to happen at the hearing. (*Id.*)

At the first hearing, the ALJ stated that this "might" be an appropriate case to order an orthopedic medical expert (Tr. at 68). Additionally, Claimant was given the opportunity to further develop the record. During the hearing, Counsel for Claimant reported that Claimant's neurosurgeon for back and leg pain, Dr. Weinsweig, had been killed in an automobile accident but stated, "I don't think that there is any new medical information from that that needs to be done, but I will check on that" (Tr. at 62). The ALJ noted that Claimant had not been to a physician for his back since 2013 (Tr. at 68). Counsel for Claimant informed the ALJ that there was evidence from Claimant's treating psychiatrist, Dr. Stultz, that had not been made part of the record (Tr. at 61). The ALJ granted Claimant's Counsel's request for a postponement to further develop the record with respect to any additional records from Dr. Stultz, as well as, any additional neurological or orthopedic records. (*Id.*)

During the supplemental hearing, the ALJ conference called Dr. Francis on the telephone regarding Claimant's alleged orthopedic impairments (Tr. at 84). The ALJ stated that he did so because Dr. Francis' information "had popped up as an attached CV to the medical file." (*Id.*) Dr. Francis informed the ALJ, over the phone, that he was not scheduled to testify in Claimant's case. (*Id.*) Dr. Francis stated, "I don't think I had that one" or "anything out of the National Hearing Center." (*Id.*) The ALJ noted that there was nothing in the electronic folder about Dr. Francis, but that he wanted to check on whether Dr. Francis had been scheduled to testify because his *curriculum vitae* had been placed in the record (Tr. at 84). The ALJ clarified that Dr. Francis had not been called by the court to testify in Claimant's case (Tr. at 83-84). His *curriculum vitae* was in the record without treatment notes and/or records. Accordingly, Dr. Francis did not provide any testimony.

At the close of the supplemental hearing, Counsel for Claimant referred the ALJ to his previous statement about obtaining an orthopedic or physical consultative examination (Tr. at 116). The ALJ stated that he thought about it and decided not to do so. (*Id.*) The ALJ explained that even though Dr. Weinsweig was tragically killed, the ALJ had his notes, which had "fairly well fleshed out" the orthopedic/physical issues, as well as Claimant' testimony (Tr. at 116-117).

The ALJ considered evidence that included clinical findings and statements from Dr. Weinsweig and Dr. Hudak, physical therapy records, objective diagnostic studies, Claimant's improvement following surgery, the need for only conservative treatment and Claimant's statements and testimony (Tr. at 39-42). The ALJ considered the treatment notes from Dr. Stultz that were submitted after the initial hearing.

Additionally, the ALJ made a determination that Claimant' allegations of debilitating back problems were not supported by the record based on sufficient evidence. The ALJ found that there was no reason to further develop the record to reach a determination on whether Claimant's back impairment was disabling under the Act. 20 C.F.R. § 404.1520b.

At the supplemental hearing, psychiatrist Dr. Schosheim testified after reviewing the medical evidence consisting of St. Mary's Medical Management records and Cabell County School records (Tr. at 82). The Medical Records contained treatment notes from Dr. Stultz, which are contained in Exhibit 22F. Dr. Schosheim testified that the record does not support a diagnosis of major depressive disorder with psychotic features (Tr. at 86). Dr. Schosheim pointed out that although Dr. Stultz identified medically determinable impairments of anxiety and depression, there was no documentation in the record to support a diagnosis of major depressive disorder and that the record seemed to only support a diagnosis of generalized anxiety disorder. (*Id.*)

The ALJ held the record open for 30 days for Claimant to obtain records from Dr. Stultz.

21

Claimant submitted treatment notes from Dr. Stultz dating from August 2014 through January 2015. These treatment notes are in the record Exhibit 29F. The ALJ discussed the differences in Dr. Stultz's and Dr. Schosheim's diagnoses and ultimately found that Dr. Schosheim's evaluation and diagnosis was fairly consistent with the review of the record.

As for Claimant's alleged mental impairments, the ALJ considered and agreed with Dr. Schosheim's testimony that the record does not support a diagnosis of major depression (Tr. at 37). The ALJ did not rely on Dr. Schosheim's opinion alone in assessing Claimant's alleged mental health symptoms (Tr. at 42). The ALJ explained that Claimant's complaints of anxiety and depression were treated conservatively with medication by his primary care physician, Dr. Hudak, until 2013 (Tr. at 42). The ALJ also noted that despite his reports of panic, agoraphobia, and social phobia, Claimant saw Dr. Stultz only sporadically, and that there had been a gap of over one year, from July 2013 to August 2014, when Claimant did not seek any treatment from Dr. Stultz (Tr. at 42).

The ALJ also considered the evaluation by psychologist Ms. Tate which suggested, at most, mild to moderate limitations due to mental health symptoms. Additionally, the ALJ considered the assessments completed by the state agency psychologists, whose opinions, along with the treatment records, expert testimony, and Ms. Tate's consultative evaluation, supported only mild to moderate mental health symptoms (Tr. at 43-44). Accordingly, the record of evidence was sufficient for the ALJ to make a determination that Claimant's allegations of mental impairments were not supported by the record.

Under these circumstances, the ALJ had no obligation to order a consultative examination because there was sufficient evidence in the record to make a fair assessment of the Claimant's abilities. Furthermore, The undersigned respectfully recommends that the District Judge find that

22

Claimant has not met his burden of showing that his impairments have caused him functional limitations so severe as to preclude him from performing light work consistent with the ALJ's residual functional capacity assessment.

Claimant asserts that the ALJ's RFC assessment is flawed because the ALJ did not consider substantial changes in his RFC (ECF No. 9). Claimant summarizes evidence pertaining to his back condition, without any discussion as to how this evidence supports a reduced RFC. (*Id.*) The ALJ's decision shows that Claimant's back condition improved with medication and treatment. In January 2012, Dr. Weinsweig saw Claimant for an exacerbation of back and leg pain (Tr. at 40, 467). Initially, Claimant told Dr. Weinsweig that he did not want any "drastic" treatment but wanted to pursue physical therapy (Tr. at 469). In January 2012, physical therapy notes showed some improvement—Claimant reported that he was "doing better" (Tr. at 746). In February 2012, Claimant reported that he had less pain following epidural steroid injections (Tr. at 445). An April 2012 CT scan of the lumbar spine showed spondylolisthesis and degenerative disc disease (Tr. at 481, 547-48).

Thereafter, on June 14, 2012, Dr. Weinsweig performed a bilateral L4 laminectomy with superior L5 laminectomy, posterior lumbar interbody fusion, and lateral mass/facet/transverse process arthrodesis (Tr. at 768-69). Following surgery, Claimant's condition improved (Tr. at 41). In August 2012, Dr. Weinsweig noted that Claimant was "doing extremely well" and that his x-rays looked great (Tr. at 647, 654). Dr. Weinsweig recommended that Claimant wear a brace for three months and then start physical therapy (Tr. at 647). In September 2012, Claimant told his physical therapist that his pain was similar to symptoms prior to surgery (Tr. at 676). However, when Dr. Weinsweig saw Claimant for follow-up care in October 2012, he noted that Claimant was doing well overall (Tr. at 675). In November 2012, Claimant was discharged from physical

therapy after meeting all goals (Tr. at 682). He was ambulating independently and reported only intermittent back pain with no pain in the lower extremities (Tr. at 683). In 2013, treatment notes showed that Claimant had a normal gait and negative straight leg-raising tests (Tr. at 809), although he complained of increased leg pain and intermittent incontinence issues (Tr. at 808).  An April 2013 MRI of the lumbar spine showed grade 1 anterolisthesis of L4 over L5 and status post fusion at L4-L5, with no acute findings (Tr. at 817). In May 2013, Dr. Weinsweig recommended physical therapy (Tr. at 820). As the ALJ explained, overall, the record showed that Claimant's symptoms improved with surgery (Tr. at 41).

The ALJ also considered the statements Dr. Weinsweig provided from January 2013 through July 2013 (Tr. at 42). In January 2013, Dr. Weinsweig provided a statement indicating that Claimant had not been able to perform his previous employment due to restrictions from heavy lifting, bending, and twisting, that his position did not allow for light duty, and that it was not likely that Claimant would be able to perform heavy manual labor in any position in the near future (Tr. at 765). In May 2013, Dr. Weinsweig stated that Claimant had improved from his surgery but had chronic pain and leg weakness, and that it was not likely Claimant would be able to perform heavy manual labor in the near future (Tr. at 822). In July 2013, Dr. Weinsweig once again stated that Claimant would be unable to perform heavy manual labor in any position in the near future (Tr. at 841). The ALJ explained that apart from a short period after his surgery, Dr. Weinsweig only suggested that Claimant could not perform heavy manual labor, which was consistent with the ALJ's RFC assessment and the medical evidence of record (Tr. at 42).  Accordingly, substantial evidence supports the ALJ's decision that Claimant's back impairment improved in the relevant period from January 1, 2012, through June 30, 2017.

Moreover, "Under the Social Security Act, [a reviewing court] must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Id.* (alterations in original) (internal quotation marks omitted). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (internal quotation marks omitted). It "consists of more than a mere scintilla of evidence but may be less than a preponderance." *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir.1996). "In reviewing for substantial evidence, we do not undertake to reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [ALJ]." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). (alteration in original) (internal quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." *Id.* (alteration in original) (internal quotation marks omitted).

Conclusion

For the reasons provided above, the undersigned respectfully recommends the District Judge find that substantial evidence supports the ALJ's  assessment of Claimant's RFC and finding that Claimant's mental impairments were non-severe. Accordingly, it is hereby respectfully **RECOMMENDED** that the presiding District Judge **DENY** Plaintiff's Brief in Support of Judgment on the Pleadings in a Social Security Case (ECF No. 9), **GRANT** the Defendant's Brief in Support of the Defendant's Decision (ECF No. 12), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from this Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Judge Robert C. Chambers.  Pursuant to the

provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Judge Chambers and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

Enter:  August 10, 2018

Dwane L. Tinsley
United States Magistrate Judge

26